```
_____ FILED _____ LODGED
_____ RECEIVED

DEC 04 2018

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____DEPUTY
```

Magistrate Judge Theresa L. Fricke

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff

v.

GREGORY DAVID WERBER,

Defendant.

CASE NO. MJ 18 - 5280

COMPLAINT for VIOLATION

Title 18, United States Code,
Sections 1956(a)(3)(B), (C) and 2

BEFORE Hon. Theresa L. Fricke, United States Magistrate Judge, U.S. Courthouse, Tacoma, Washington.

The undersigned complainant being duly sworn states:

## COUNT ONE

### (Money Laundering)

On or about November 29, 2018, in King County, in the Western District of Washington, and elsewhere, GREGORY DAVID WERBER, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which transaction involved property which was represented by a law enforcement officer to be the proceeds of specified unlawful activity, specifically, distribution of controlled substances, in violation of Title 21, United States Code, Section 841, with the intent to conceal and disguise the nature, location, source, ownership and control, of property

COMPLAINT/*United States v. Werber* - 1
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 believed to be the proceeds of some form of unlawful activity and to avoid a transaction

2 reporting requirement under State or Federal law.

3       All in violation of Title 18, United States Code, Sections 1956(a)(3)(B),

4 1956(a)(3)(C) and 2.

5

6       And the complainant states that this Complaint is based on the following

7 information:

8       I, Anthony DelVecchio, being first duly sworn on oath, depose and say:

9 **I.       AFFIANT BACKGROUND AND QUALIFICATIONS**

10      1.      I am an "investigative or law enforcement officer of the United States"

11 within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of

12 the United States who is empowered by law to conduct investigations of, and to make

13 arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

14      2.      I am a Special Agent with the Drug Enforcement Administration (DEA),

15 and have been since May 2012. I am currently assigned to the Seattle Field Division,

16 Tacoma Resident Office. Prior to my employment with the DEA, I worked as a tax

17 investigator for the State of New Jersey, from October 2010 to May 2012.

18      3.      I received formal training at the DEA Basic Agent Training in Quantico,

19 Virginia. The four-month Basic Academy included comprehensive, formalized

20 instruction in, among other things: basic narcotic investigations, drug identification and

21 detection, familiarization with United States narcotics laws, financial investigations and

22 money laundering, identification and seizure of drug-related assets, organized crime

23 investigations, physical and electronic surveillance, and undercover operations.

24      4.      During the course of my law enforcement career, I have been involved in

25 investigations of numerous criminal offenses, including the offenses involved in this

26 current investigation. I have participated in more than 50 criminal investigations of illicit

27 drug trafficking organizations, ranging from street-level dealers to major dealers—

28 including Mexico-based drug trafficking organizations. These investigations have also

COMPLAINT/*United States v. Werber* - 2
2017R01238

1  included the unlawful importation, possession with intent to distribute, and distribution of
2  controlled substances; the related laundering of monetary instruments; the conducting of
3  monetary transactions involving the proceeds of specified unlawful activities; and
4  conspiracies associated with criminal narcotics offenses.  These investigations have
5  included use of the following investigative techniques:  confidential informants;
6  undercover agents; analysis of pen register, trap and trace, and toll records; physical and
7  electronic surveillances; wiretaps; and the execution of search warrants.

8          5.      I have had the opportunity to monitor, listen to, review transcripts and line
9  sheets (prepared by linguists) documenting the content of hundreds of intercepted
10  conversations involving the trafficking of cocaine, methamphetamine, marijuana, and
11  other narcotics, by persons who used some form of code to thwart law enforcement.  I
12  also have also interviewed defendants at the time of their arrests and have debriefed,
13  spoken with, or interviewed numerous drug dealers or confidential sources (informants)
14  at proffer interviews who were experienced in speaking in coded conversation over the
15  telephone.  In many of these interviews and debriefings, I was able to speak with these
16  drug traffickers about specific conversations in which they were intercepted pursuant to
17  electronic surveillance.  From these interviews, and also from discussions with other
18  experienced agents, I have gained knowledge regarding the various methods, techniques,
19  codes, and/or jargon used by drug traffickers in the course of their criminal activities,
20  including their use of firearms to protect their narcotics related activities and their use of
21  cellular telephones and other electronic devices to facilitate communications while
22  avoiding law enforcement scrutiny.

23          6.      I have authored, planned, and participated in the execution of more than 30
24  search warrants authorizing the search of locations associated with drug traffickers and
25  their co-conspirators, such as residences, businesses, storage facilities, outbuildings,
26  safety deposit boxes, and vehicles.  Additionally, I have authored and supervised the
27  execution of dozens of tracking warrants, including multiple federal tracking warrant
28  affidavits for vehicles and cellular telephones.  I have testified in grand jury proceedings

COMPLAINT/*United States v. Werber* - 3
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    and written reports in the course of investigations.  These investigations have resulted in

2    numerous state and federal prosecutions of individuals who have possessed, imported, or

3    distributed controlled substances, including marijuana, cocaine, methamphetamine,

4    heroin, and prescription medications, as well as the seizure of those illegal drugs and the

5    proceeds from their sale.

6              **II.       PURPOSE OF AFFIDAVIT**

7        7.      This Affidavit is made in support of a complaint charging Gregory David

8    WERBER with the offense of Money Laundering, in violation of Title 18, United States

9    Code, Sections 1956(a)(3)(B), 1956(a)(3)(C) and 2.

10             **III.      SOURCES OF INFORMATION**

11       8.      My knowledge of the facts set forth in this Affidavit is a result of my

12   personal participation in the investigation, my conversations with other law enforcement

13   personnel participating in this and related investigations, and my review of relevant

14   documents.  I have obtained and read the official reports prepared by various law

15   enforcement officers participating in the instant investigation, and other investigations

16   discussed herein.

17       9.      I know through training and experience, as well as the training and

18   experience of other law enforcement officers familiar with this investigation, individuals

19   involved in the distribution of controlled substances and other criminal activity often use

20   vague references and/or coded words and phrases when discussing illegal activity.  In this

21   investigation, these communications have been conducted in both English and Spanish,

22   and the participants frequently used coded language to refer to drug-trafficking activity.  I

23   have reviewed information that was originally in Spanish in connection with this

24   investigation; individuals fluent in the Spanish language translated this information into

25   English.  When coded words and phrases were used in the instant investigation, I have

26   used my training and experience, as well as the training and experience of other law

27   enforcement officers familiar with this investigation and information provided by the

28

COMPLAINT/*United States v. Werber* - 4
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   confidential source participating in this investigation, to understand the meaning of these

2   coded words and phrases.

3         10.    Because I am submitting this Affidavit for the limited purpose of

4   establishing probable cause for the above-referenced charge, I have not included every

5   fact known to me concerning the investigation.  I have set forth only the facts that I

6   believe are essential for a fair determination of probable cause.

7                **IV.**    **PROBABLE CAUSE**

8   **A.**    **Background on Cryptocurrency and the Dark Web**

9         11.    Based on my training, research, education, and experience, I am familiar

10   with the following relevant terms and definitions:

11         12.    The "dark web" is a portion of the "Deep Web"[1] of the Internet, where

12   individuals must use an anonymizing software or application called a "darknet" to access

13   content and websites.  Within the dark web, criminal marketplaces operate, allowing

14   individuals to buy and sell illegal items, such as drugs, firearms, and other hazardous

15   materials, with greater anonymity than is possible on the traditional Internet (sometimes

16   called the "clear web" or simply the "web"). These online market websites use a variety

17   of technologies, including the Tor network (defined below) and other encryption

18   technologies, to ensure that communications and transactions are shielded from

19   interception and monitoring. Famous dark web marketplaces, also called Hidden

20   Services, such as Silk Road, AlphaBay, and Hansa (all of which have since been shut

21   down by law enforcement), operated similarly to clear web  commercial websites such as

22   Amazon and eBay, but offered illicit goods and services.

23         13.    "Vendors" are the dark web's sellers of goods and services, often of an

24   illicit nature, and they do so through the creation and operation of "vendor accounts" on

25   dark web marketplaces. Customers, meanwhile, operate "customer accounts." Vendor

26

27

---

28  [1] The Deep Web is the portion of the Internet not indexed by search engines. Examples are databases and internal networks belonging to private industry, government agencies, or academic institutions.

COMPLAINT/*United States v. Werber* - 5
2017R01238

1   and customer accounts are not identified by numbers, but rather monikers or "handles,"

2   much like the username one would use on a clear web site. If a moniker on a particular

3   marketplace has not already been registered by another user, vendors and customers can

4   use the same moniker across multiple marketplaces, and based on seller and customer

5   reviews, can become well known as "trusted" vendors or customers. It is also possible for

6   the same person to operate multiple customer accounts and multiple vendor accounts at

7   the same time. For example, based on my training and experience, I know that one person

8   could have a vendor account that he or she uses to sell illegal goods on a dark web

9   marketplace in exchange for cryptocurrency; that same vendor could also have a different

10  customer account that he or she uses to exchange cryptocurrency earned from vendor

11  sales for fiat currency.[2]   Because they are separate accounts, a person could use different

12  accounts to send and receive the same cryptocurrency on the dark web. I know from

13  training and experience that one of the reasons dark web vendors have multiple monikers

14  for different vendor and customer accounts, is to prevent law enforcement from

15  identifying which accounts belong to the same person, and who the actual person is that

16  owns or uses the accounts.

17        14.     The "Tor network," or simply "Tor" (an abbreviation for "The Onion

18  Router"), is a special network of computers on the Internet, distributed around the world,

19  designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing

20  the network, and, thereby, the locations and identities of the network's users. Tor also

21  enables websites to operate on the network in a way that conceals the true IP addresses of

22  the computer servers hosting the websites, which are referred to as "hidden services" on

23  the Tor network. Such hidden services operating on Tor have complex web addresses,

24  generated by a computer algorithm, ending in ".onion" and can only be accessed through

25  specific web browser software, including a browser known as "Tor Browser," designed to

26  access the Tor network. Examples of hidden services websites are the aforementioned

27

28

---

[2] Fiat currency is currency issued and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.

COMPLAINT/*United States v. Werber* - 6
2017R01238

1  AlphaBay and Hansa. Tor is available on cellphones using the Android and Apple

2  operating systems by installing an application that puts a TOR-enabled internet browser

3  on a user's cellphone, which then routes the phone's IP address through different servers

4  all over the world, making it extremely difficult to track.

5      15.    Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer,

6  network-based medium of value or exchange that may be used as a substitute for fiat

7  currency to buy goods or services or exchanged for fiat currency or other

8  cryptocurrencies.  Examples of cryptocurrency are Bitcoin, Litecoin, and Ether.

9  Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in

10  cloud-based servers.  Although not usually stored in any physical form, public and

11  private keys (described below) used to transfer cryptocurrency from one person or place

12  to another can be printed or written on a piece of paper or other tangible object.

13  Cryptocurrency can be exchanged directly person to person, through a cryptocurrency

14  exchange, or through other intermediaries.  Generally, cryptocurrency is not issued by

15  any government, bank, or company; it is instead generated and controlled through

16  computer software operating on a decentralized peer-to-peer network.  Most

17  cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the

18  decentralized network, containing an immutable and historical record of every

19  transaction.   Cryptocurrency is not illegal in the United States.

20      16.    Bitcoin is a type of cryptocurrency.  Payments or transfers of value made

21  with bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any

22  single administrator or entity.  As mentioned above, individuals can acquire bitcoin

23  through exchanges (i.e., online companies which allow individuals to purchase or sell

24  cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin

25  ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by

26  "mining."  An individual can "mine" bitcoins by using his or her computing power to

27  solve a complicated algorithm and verify and record payments on the blockchain.

28  Individuals are rewarded for this task by receiving newly created units of a

COMPLAINT/*United States v. Werber* - 7
2017R01238

1  cryptocurrency. Individuals can send and receive cryptocurrencies online using many
2  types of electronic devices, including laptop computers and smart phones. Even though
3  the public addresses of those engaging in cryptocurrency transactions are recorded on a
4  blockchain, the identities of the individuals or entities behind the public addresses are not
5  recorded on these public ledgers. If, however, an individual or entity is linked to a public
6  address, it may be possible to determine what transactions were conducted by that
7  individual or entity. Bitcoin transactions are therefore sometimes described as
8  "pseudonymous," meaning that they are partially anonymous. And while it's not
9  completely anonymous, bitcoin allows users to transfer funds more anonymously than
10  would be possible through traditional banking and financial systems.[3]

11      17.     Cryptocurrency is stored in a virtual account called a wallet. Wallets are
12  software programs that interface with blockchains and generate and/or store public and
13  private keys used to send and receive cryptocurrency. A public key or address is akin to
14  a bank account number, and a private key is akin to a PIN number or password that
15  allows a user the ability to access and transfer value associated with the public address or
16  key. To conduct transactions on a blockchain, an individual must use the public address
17  (or "public key") and the private address (or "private key"). A public address is
18  represented as a case-sensitive string of letters and numbers, 26–25 characters long. Each
19  public address is controlled and/or accessed through the use of a unique corresponding
20  private key—the cryptographic equivalent of a password or PIN—needed to access the
21  address. Only the holder of an address' private key can authorize any transfers of
22  cryptocurrency from that address to another cryptocurrency address.

23      18.     Although cryptocurrencies such as bitcoin have legitimate uses,
24  cryptocurrency is also used by individuals and organizations for criminal purposes such
25  as money laundering, and is an oft-used means of payment for illegal goods and services

26

27

---

28  [3] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate
transactions, making it difficult to trace or attribute transactions.

COMPLAINT/*United States v. Werber* - 8
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   on hidden services websites operating on the Tor network.  By maintaining multiple

2   wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law

3   enforcement's efforts to track purchases within the dark web marketplaces. As of

4   December 2, 2018, one bitcoin is worth approximately U.S. $4,097.47 (*see*

5   www.coinbase.com) though the value of bitcoin is generally much more volatile than that

6   of fiat currencies.

7          19.     Exchangers and users of cryptocurrencies store and transact their

8   cryptocurrency in a number of ways, as wallet software can be housed in a variety of

9   forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC

10   or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online

11   wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed

12   public and private keys ("paper wallet"), and as an online account associated with a

13   cryptocurrency exchange.  Because these desktop, mobile, and online wallets are

14   electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or

15   at websites that users can access via a computer, smart phone, or any device that can

16   search the Internet.  Moreover, hardware wallets are located on some type of external or

17   removable media device, such as a USB thumb drive or other commercially available

18   device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger).  In

19   addition, paper wallets contain an address and a QR code with the public and private key

20   embedded in the code.   Paper wallet keys are not stored digitally.  Wallets can also be

21   backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a

22   "recovery seed" (random words strung together in a phrase) or a complex password.

23   Additional security safeguards for cryptocurrency wallets can include two-factor

24   authorization (such as a password and a phrase).  I also know that individuals possessing

25   cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies

26   become further secured in the event that their assets become potentially vulnerable to

27   seizure and/or unauthorized transfer.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    20.    Bitcoin "exchangers" and "exchanges" are individuals or companies that

2  exchange bitcoin for other currencies, including U.S. dollars.  According to Department

3  of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on

4  March 18, 2013, virtual currency administrators and exchangers, including an individual

5  exchanger operating as a business, are considered money services businesses.  Such

6  exchanges and exchangers are required to register with FinCEN and have proper state

7  licenses (if required under applicable state law).  From my training and experience, I

8  know that registered money transmitters are required by law to follow Bank Secrecy Act

9  anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC")

10  protocols, and other verification procedures similar to those employed by traditional

11  financial institutions. For example, FinCEN-registered cryptocurrency exchangers often

12  require customers who want to open or maintain accounts on their exchange to provide

13  their name, address, phone number, and the full bank account and routing numbers that

14  the customer links to an exchange account.  As a result, there is significant market

15  demand for illicit cryptocurrency-for-fiat currency exchangers, who lack AML or KYC

16  protocols and often also advertise their ability to offer customers stealth and anonymity.

17  These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting

18  customers in person or by shipping cash through the mail.  Due to the illicit nature of

19  these transactions and their customers' desire for anonymity, such exchangers are

20  frequently able to charge a higher exchange fee, often as high as 9–10% (in contrast to

21  registered and BSA-compliant exchangers, who may charge fees as low as 1–2%).

22    21.    Some companies offer cryptocurrency wallet services which allow users to

23  download a digital wallet application onto their smart phone or other digital device.  A

24  user typically accesses the wallet application by inputting a user-generated PIN code or

25  password.  Users can store, receive, and transfer cryptocurrencies via the application;

26  however, many of these companies do not store or otherwise have access to their users'

27  funds or the private keys that are necessary to access users' wallet applications.  Rather,

28  the private keys are stored on the device on which the wallet application is installed (or

COMPLAINT/*United States v. Werber* - 10
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 │ any digital or physical backup private key that the user creates).  As a result, these

2 │ companies generally cannot assist in seizing or otherwise restraining their users'

3 │ cryptocurrency.  Nevertheless, law enforcement could seize cryptocurrency from the

4 │ user's wallet directly, such as by accessing the user's smart phone, accessing the wallet

5 │ application, and transferring the cryptocurrency therein to a law enforcement-controlled

6 │ wallet.  Alternatively, where law enforcement has obtained the recovery seed for a wallet

7 │ (see above), law enforcement may be able to use the recovery seed phrase to recover or

8 │ reconstitute the wallet on a different digital device and subsequently transfer

9 │ cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

10 │ **B.     The Drug Investigation**

11 │       22.     The Drug Enforcement Administration (DEA) and Homeland Security

12 │ Investigations (HSI) are investigating Gregory David WERBER and his business, Coin

13 │ Services International, for laundering the cash drug proceeds of a transnational, highly

14 │ lucrative, drug trafficking organization (the "DTO") operating within the Western

15 │ District of Washington, and elsewhere.  Based upon an intensive and ongoing

16 │ investigation, investigators believe that this DTO is responsible for distributing

17 │ significant quantities of heroin, crystal methamphetamine, and fentanyl-laced counterfeit

18 │ oxycodone pills, in Pierce, Kitsap, King, Skagit, and Snohomish Counties, and elsewhere,

19 │ as directed by individuals located in Mexico.

20 │       23.     On November 30, 2018, a federal grand jury in the Western District of

21 │ Washington returned a sealed indictment charging 31 members of this DTO as follows.

22 │ Count 1 of the indictment charges Carlos Eduardo LOPEZ Hernandez, Daniel Osvaldo

23 │ ROCHA Lopez, Jaime HEREDIA Castro, Juan AVILES Berrelleza, Edgar CABRERA,

24 │ Carlos Alejandro CASTRO Perez, Cesar LOYA Soto, Manuel LOYA Soto, Julian Gauge

25 │ ORDONEZ, Jose Luis SIERRA Barrientos, Hector Manuel URIAS Moreno, Jorge

26 │ VALENZUELA Armenta, Uriel ZELAYA, Arturo FRIAS Ceballos, Juan Jose

27 │ HIGUERA Gonzalez, Jesus Rene SARMIENTO Valenzuela, Alek James

28 │ BAUMGARTNER, Monique GREEN, Andrew Cain KRISTOVICH, Brian LIVELY,

COMPLAINT/*United States v. Werber* - 11
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    Jose RANGEL Ortega, Gerald Keith RIGGINS, Esther La Rena SCOTT, Michael John

2    SCOTT, Karen SURYAN, Orlando BARAJAS, Oscar Humberto CARRILLO Salcedo,

3    Martin GONZALEZ Jimenez, Hector Mario JACOBO Chairez, Jesus Alfonso MORA

4    Quinonez, Ramon PUENTES, and others known and unknown, with Conspiracy to

5    Distribute Controlled Substances, to wit: heroin, fentanyl, and methamphetamine, in

6    violation of Title 21, United States Code, sections 841(a)(1) and 846.  Count 2 charges

7    Jaime HEREDIA Castro, Orlando BARJAS, and others known and unknown, with

8    Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code,

9    Sections 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), and 1956(h).  Count 3 charges Oscar

10   Humberto CARRILLO Salcedo, Carlos Eduardo LOPEZ Hernandez, Daniel Osvaldo

11   ROCHA Lopez, Edgar CABRERA, and others known and unknown with Conspiracy to

12   Commit Money Laundering, in violation of Title 18, United States Code, Sections

13   1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), and 1956(h).

14        24.    Agents repeatedly have seized drugs during the investigation into this DTO.

15   For example, on August 31, 2018, agents executed a delayed-notice search warrant at a

16   residence in Auburn, Washington, where investigators had repeatedly observed ROCHA

17   and LOPEZ via physical and electronic surveillance.  Agents recovered 560 grams of

18   suspected marijuana, 41 grams of suspected crystal methamphetamine, roughly a

19   kilogram of suspected heroin, over 3,200 pills, and $164,116 in cash drug proceeds.  Due

20   to potential fentanyl contamination with these drugs, agents did not unwrap or field-test

21   any of these substances.  All of the weights listed above are approximate and include

22   packaging.

23        25.    Agents submitted those pills (along with other drugs seized from the

24   apartment) to the DEA's Western Regional Laboratory for testing and analysis.  DEA

25   chemists performed a random sampling analysis of the pills and found they contained

26   lidocaine hydrochloride, fentanyl, acetylfentanyl, and ANPP (a precursor chemical).

27   Chemists tested another substance agents seized during this search and found it weighed

28   646 grams and was between 40% and 50% pure heroin.  Agents tested additional

COMPLAINT/*United States v. Werber* - 12
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  substances and found more heroin, with purity in the 30% to 40% range.  Chemists were

2  also able to test some of the other substances recovered during the search, and found the

3  tan powder substance seized during the search was about 385 grams of a diluting agent,

4  not heroin. DEA chemists are still working to analyze the remaining items seized by

5  agents during this search.

6         26.     More recently, on November 28, 2018, Oregon State Police (OSP)

7  conducted a traffic stop of Martin GONZALEZ.  Agents had previously observed

8  GONZALEZ, via physical and electronic surveillance, meeting with HEREDIA and,

9  later, with CABRERA, in the Western District of Washington, under circumstances that

10  led investigators to believe that GONZALEZ was delivering bulk quantities of narcotics

11  to them.  On November 28, 2018, GONZALEZ was driving his tractor-trailer truck

12  (which investigators had previously observed him operating).  OSP stopped GONZALEZ

13  due to records checks that showed GONZALEZ lacked the proper medical clearances to

14  operate his tractor-trailer.  GONZALEZ gave consent for the OSP trooper to deploy his

15  drug-sniffing K-9 around GONZALEZ's vehicle.  The K-9 alerted to the presence of

16  drugs in the engine compartment of GONZALEZ's vehicle.  Troopers found 10 packages

17  of suspected heroin (weighing roughly 13 pounds in total), hidden inside one of the air

18  filters on GONZALEZ's truck.  OSP troopers arrested GONZALEZ and booked him on

19  state charges.

20  **C.    Investigators Discover Connections between WERBER, his Business, and the**
21  **DTO**

22         27.     Agents initially discovered WERBER's connection to this DTO through

23  phone records showing that HEREDIA (on TT18, HEREDIA's phone at that time) was in

24  contact with 614-531-6939 (referred to herein as "TT37") in February 2018.[4]  Phone

25  company records show that TT37 is a cellular phone with service provided by AT&T,

26

27  _____

28  [4] Agents identified HEREDIA through investigative techniques such as court-authorized tracking of cell phones and
   vehicles, court-authorized interception of wire and electronic communications, and coordinated physical
   surveillance.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  subscribed to Gregory WERBER and Coin Services International, at 2318 East Cairo
2  Drive, Tempe, Arizona. Service to TT37 began on July 10, 2018.

3        28.    Through records checks, agents learned that Gregory David WERBER
4  maintains an Arizona driver's license in that name, which lists his address as one in
5  Venice, California (known to me but not included in this Affidavit). Based on public
6  database research, agents believe WERBER also has an address in Arizona, located at
7  2318 East Cairo Drive, Tempe, Arizona. As discussed herein, WERBER operates a
8  cryptocurrency business, Coin Services International. WERBER's business was
9  previously located at this address in Tempe, Arizona, and elsewhere, and is presently
10  located at 3922 Highland Avenue, Manhattan Beach, California.

11        29.    WERBER's criminal history is extensive, with arrests dating back to 1981
12  and convictions dating back to 1982. Per NCIC, in 1982, WERBER was charged with
13  five counts of Forge Name on a Credit Card, three counts of Grand Theft Auto, three
14  counts of Grand Theft Property, three counts of Forgery, and one count of Possession of a
15  Narcotic/Controlled Substance, and was sentenced to five years in prison for the
16  controlled substance violation (California). In 1984, WERBER was arrested for
17  Involuntary Manslaughter and Transport/Sell a Narcotic/Controlled Substance
18  (California). In 1985, WERBER's criminal record shows a felony conviction for Prison
19  Escape without Force (California). In 1986, WERBER was convicted of felony Stolen
20  Motor Vehicle Aiding & Abetting and False Statement to Government, and was
21  sentenced to five years in prison (Texas). In 1990, he was convicted of another felony,
22  Interstate Transportation of Securities, and sentenced to 47 months in prison (New
23  Jersey). In 1994, WERBER was convicted of Conspiracy to Commit Credit Card Fraud
24  and the Transfer of Stolen Goods, Transportation of Stolen Goods and Unauthorized
25  Use/Access Device, and was sentenced to four years in prison (New York). In 1996,
26  WERBER was found to be in violation of his conditions of supervised release and was
27  sentenced to nine months in prison. In 1999, WERBER was arrested in Arizona for
28  counterfeiting. In 2007, WERBER was arrested for Trafficking in Drugs, Possession of

COMPLAINT/*United States v. Werber* - 14
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Drugs, Possession of Criminal Tools; from this, WERBER's criminal record shows a
2  felony conviction for Trafficking in Drugs with a sentence of five years' imprisonment
3  (Ohio).

4      30.    Public source research for WERBER, Coin Services International, and
5  WERBER's phone number (TT37) revealed a website for Coin Services International
6  (www.coinservicesinternational.com) that states, in part, as follows:



7
8
9
10  About Us
11
12  Coin Services International provides the full array of digital currency services and advice
    to our clients world-wide. Whether you are new to digital currency and simply want to
    use, acquire or invest in digital currency, or require more complex services and advice,
13  Coin Services International is here for you. Our Coin Services International offices are
    conveniently located near the Los Angeles International Airport at 3922 Highland
14  Avenue Manhattan Beach, California 90266. Come in or call for an appointment and see
    what we can do for you at +1 614 531-6939.
15
16  Gregory David Werber
    Founder and CEO
17

18      31.    On this website, WERBER listed various services available through Coin
19  Services International, including wallet services, buying/selling digital currency, trading,
20  options, margin trading, transfers, cold wallet storage, insurance, smart contracts,
21  tumbling, digital currency mining, custom digital currency software development,
22  consultant and advisory services, training, legal consultation, entity formation, tax
23  strategy, ATM services and management, and payment portals.

24      32.    A search of recorded documents filed in Maricopa County, Arizona, shows
25  WERBER filed a certificate to do business under the name "Coin Services International"
26  on January 19, 2018.  According to the Arizona Secretary of State's public website,
27  WERBER registered this business on February 26, 2018; the business expiration date is
28

COMPLAINT/*United States v. Werber* - 15
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   February 26, 2023.  The business has an associated address of 2318 East Cairo Drive,

2   Tempe, Arizona with a phone number of 614-531-6939 (TT37).

3        33.     Investigators also located an advertisement on the website

4   LocalBitcoins.com for "bitadvisor," with WERBER's phone number (TT37).  Based on

5   my training and experience, and my discussions with experienced investigators, I am

6   aware that LocalBitcoins.com is a website where individuals can post advertisements for

7   buying and selling cryptocurrency, such as bitcoins, in exchange for cash.  The

8   advertisement states in part as follows:

## bitadvisor ●

**Bitadvisor for your crypto buy, sell, trade, and other needs.**
**Call: (614) 531-6939**

**Web:**
**CoinServicesInternational.com**

**Email: bitadvice@protonmail.com**

18        34.     Based upon my discussions with other experienced investigators, I am

19   aware that "Protonmail" is an email service based outside the United States that provides

20   encrypted email services.

21        35.     WERBER's "bitadvisor" advertisement also states he will buy or sell

22   bitcoins for cash in any amount from $1,000 to $100,000, and that he prefers to meet at

23   3922 Highland Avenue, Manhattan Beach, California, "safely and securely in our

24   offices."

25        36.     Agents learned the Port of Seattle Police stopped WERBER in March 2018,

26   and found $140,000 of cash on WERBER's person while he was traveling through the

27   Seattle-Tacoma International Airport.  In explaining why that he was carrying so much

28   cash on his person, WERBER cited his cryptocurrency business.

COMPLAINT/*United States v. Werber* - 16
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

37.    It should be noted that although WERBER has openly advertised that he is in the cryptocurrency exchange business, he has not registered as a money service business (MSB) as required by law.  Based upon my training and experience, and my discussions with other experienced agents and investigators, I know that under the applicable regulations, a person doing business as a currency dealer or exchanger is considered to be operating as an MSB.  An internet search of the public MSB registrant list maintained by the Department of the Treasury, Financial Crimes Enforcement Network ("FinCEN") did not locate Gregory WERBER or his business, Coin Services International, as a registered MSB with the Department of the Treasury.  I further know that Title 18, United States Code, Section 1960, makes it a crime to conduct, control, manage, supervise, direct, or own a money transmitting business while failing to register with FinCEN in accordance with 31 U.S.C. § 5330, *see* 18 U.S.C. § 1960(b)(1)(B)).  Additionally, I am also aware that it is also a crime to conduct, control, manage, supervise, direct, or own a money transmitting business, or while transmitting or transporting funds known to be derived from a criminal offense or with the intention to promote unlawful activity, *see* 18 U.S.C. § 1960(b)(1)(B)).

38.    The tolls showing phone contact between HEREDIA and TT37 was only the first link that investigators identified between the DTO and WERBER. As the investigation progressed, investigators observed CARRILLO repeatedly meet with DTO members, including LOPEZ, ROCHA, and CABRERA[5] in the greater Seattle area, under circumstances that led them to believe that the DTO members were providing cash drug proceeds to CARRILLO.[6]  Indeed, based upon the investigation, agents believe that

---

[5] Agents identified LOPEZ, ROCHA and CABRERA through investigative techniques such as court-authorized tracking of cell phones and vehicles, court-authorized interception of wire and electronic communications, and coordinated physical surveillance.

[6] Agents identified CARRILLO through physical surveillance and car rental records on August 30, 2018.  During the surveillance that day, CARRILLO was driving a vehicle with plates that returned to Enterprise Rentals. Enterprise Rental records show the vehicle was rented to an "Oscar Tarrillo Salcedo." Further database checks showed Oscar Humberto CARRILLO Salcedo has a tourist visa for the U.S. and was applying as a pilot for a C1/D visa with some supporting documentation; his photo in databases matches that of surveillance photos.

1   CARRILLO travels throughout the United States and collects money from various drug

2   traffickers, which he then ships or transports to WERBER in Manhattan Beach,

3   California.

4        39.    From September 18 to September 21, 2018, agents observed CARRILLO

5   via physical and electronic surveillance in Washington, Oregon, and California.  While

6   CARRILLO was in Washington, he met with Carlos LOPEZ (TT51) twice for suspected

7   money pickups, twice visited a storage unit at 1st Avenue Self-Storage in Seattle that

8   records indicate WERBER had rented, and shipped a FedEx box to WERBER using

9   WERBER's FedEx account.

10       40.    More specifically, on September 18, 2018, agents monitoring TT50's real-

11  time tracking noticed the device traveled from Memphis, Tennessee (where the device

12  was the prior day as well) to Newark, New Jersey, and then from Newark to Seattle,

13  Washington.  WERBER's FedEx account records show a package was shipped from a

14  FedEx location in Memphis, Tennessee on September 17, 2018, consistent with TT50's

15  tracking data in Memphis on the same day.  FedEx records show that the package shipped

16  from Memphis on September 17, 2018, weighed two pounds and arrived in Manhattan

17  Beach, California on September 18, 2018.  WERBER signed for this package at

18  10:32 a.m.

19       41.    Agents believe CARRILLO and WERBER are working together to launder

20  cash drug proceeds for the DTO.  However, FedEx records show that WERBER's FedEx

21  account has been used to ship at least 17 separate packages – weighing a total of 131

22  pounds – from the Western District of Washington to Manhattan Beach, California.

23  WERBER signed for all of these packages.  Based upon the weight of the packages,

24  agents estimate the value of these shipments to be between $59,420 (if all of the packages

25  contained only $1 bills) and $5,942,000 (if all of the packages contained only $100 bills).

26

27

28

COMPLAINT/*United States v. Werber* - 18
2017R01238

42.     On September 18, 2018, after CARRILLO made his flight connections from the East Coast, real-time tracking of TT50 showed CARRILLO landed at SeaTac International Airport at 7:20 p.m. and then traveled to the rental car section of the airport, arriving there at 8:05 p.m. Based on the following day's physical surveillance, agents know CARRILLO rented a black Nissan sedan from Enterprise during that time. By 8:20 p.m. on September 18, 2018, TT50's real-time tracking showed CARRILLO was at the "Hotel Interurban" located at 223 Andover Park East, Tukwila, Washington.

43.     Approximately half an hour later, CARRILLO met with LOPEZ. Real-time tracking for TT50 (CARRILLO), TT51 (LOPEZ) and TV4 (LOPEZ's vehicle) showed they were all at the same location (the Red Robin restaurant at 17300 Southcenter Parkway, Tukwila) at the same time (8:49 p.m.) on September 18, 2018. LOPEZ (according to TV4's tracking) only remained there for a few minutes, before leaving and driving back to his residence in Kent. TT50's real-time tracking indicated CARRILLO had also left the location before 9:00 p.m. and returned to his nearby hotel. Based on the investigation, agents believe LOPEZ (TT51) and CARRILLO (TT50) met for just a few minutes on September 18, 2018, in order for LOPEZ to give CARRILLO drug proceeds. The following morning, September 19, 2018, tracking data for CARRILLO's phone (TT50) showed that he visited 1st Avenue Self-Storage in Seattle, Washington.

44.     Also on the morning of September 19, 2018, agents followed CARRILLO (in his rental vehicle) from his hotel to a FedEx shipping center in Tukwila, Washington. There, agents watched CARRILLO bring a white FedEx box into the store and ship it. Shortly thereafter, agents spoke with FedEx employees at that particular branch location and examined the exterior of CARRILLO's package. The package CARRILLO brought to the store to be shipped was addressed to "Greg Werber or Ellen Davenport" at the "FedEx Office Print & Ship Center" at "1139 Artesia Boulevard, Manhattan Beach, California." This address is very close to the location where the real-time tracking of WERBER's phone (TT37) (tracked per Court authorization) routinely places the device.

COMPLAINT/*United States v. Werber* - 19
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | Additionally, this package showed it was being shipped from "Gregory Werber, 2318
2 | East Cairo Drive, Tempe, Arizona."

3 |      45.    Through physical and electronic surveillance, agents learned that
4 | CARRILLO and LOPEZ also met on the evening of September 19, 2018. At the
5 | meeting, LOPEZ gave CARRILLO a large black bag (of suspected cash drug proceeds).
6 | On September 20, 2018, CARRILLO again traveled to 1st Avenue Self-Storage in
7 | Seattle.

8 |      46.    After CARRILLO left the storage unit on September 20, 2018, he drove to
9 | the Enterprise rental location at the SeaTac airport and exchanged his original rental
10 | vehicle for a different vehicle. Physical surveillance units lost sight of CARRILLO
11 | during this swap, but eventually caught up to him (using the real-time tracking of TT50)
12 | as he was traveling south on Interstate 5 to his suspected then-residence in Oregon. From
13 | there, TT50's tracking showed CARRILLO drove all the way down to Manhattan Beach,
14 | California.

15 |      47.    Based on tracking data associated with WERBER's phone (TT37), agents
16 | believe WERBER resides at a multimillion-dollar residence divided into separate
17 | apartments, on the beach in Manhattan Beach, California. As noted above, agents know
18 | CARRILLO sent a FedEx package to WERBER on September 19, 2018, that was to be
19 | picked up at a mail store in Manhattan Beach, California. At around 10:00 p.m. on
20 | September 21, 2018, tracking data associated with TT50 showed CARRILLO arrived in
21 | Manhattan Beach. Agents' initial review of the tracking data associated with TT50
22 | (CARRILLO) and TT37 (WERBER) showed the two devices were within two blocks of
23 | each other—which is extremely close considering the typical distance between these two
24 | individuals on any given day. Further review of this same tracking data showed TT37's
25 | tracking certainty factor was 15 meters and indicated the device was located at the
26 | Pancho's Restaurant (located at 3615 Highland Avenue, Manhattan Beach, California).
27 | TT50's tracking certainty factor around that same time was 245 meters, but, when
28 | multiple data point were charted on a map, agents found they were almost directly

COMPLAINT/*United States v. Werber* - 20
2017R01238

1  centered on Pancho's Restaurant. That restaurant is four blocks away from WERBER's
2  business. I believe CARRILLO likely drove a large sum of money down to WERBER in
3  Manhattan Beach, California.

4      48.    After this suspected trip to deliver money to WERBER, CARRILLO stayed
5  in a nearby hotel in Manhattan Beach. After that, agents believe CARRILLO traveled to
6  Mexico because TT50's tracking data began showing an "Absent Subscriber" message.
7  When TT50 began sending tracking data once again, agents saw the device was near the
8  Otay Mesa, California Port of Entry. From there, CARRILLO traveled to San Diego,
9  California and stayed in a hotel, until he traveled to Salt Lake City, Utah.

10      49.    During the morning of September 26, 2018, tracking data associated with
11  CARRILLO's phone (TT50) showed the device was near the San Diego airport. Flight
12  records showed CARRILLO traveled from San Diego, California, to Salt Lake City,
13  Utah, that same day. Agents believed CARRILLO was traveling to Utah to pick up drug
14  proceeds from a drug trafficker in the Salt Lake City area. DEA agents in Salt Lake City
15  conducted a traffic stop of CARRILLO after he met with this individual. Agents in Salt
16  Lake City searched CARRILLO's rental vehicle and recovered roughly $100,000 in cash
17  from a piece of luggage that was in the vehicle. CARRILLO was uncooperative with
18  agents and provided only the bare minimum identifying information to the agent who
19  conducted the traffic stop, and refused to provide his phone number to these agents in
20  Salt Lake City.

21      50.    Agents seized the cash from CARRILLO and released him. After the
22  traffic stop, pen register data associated with TT50 showed CARRILLO was in contact
23  with a Mexico phone number. Tracking data associated with TT50 showed CARRILLO
24  drove to a nearby dead-end road. TT50 remained there for several hours and then
25  stopped sending any tracking information. CARRILLO made no other outgoing calls
26  from TT50 after his communications the Mexico phone number. During the
27  investigation, CARRILLO has shown he is careful to take steps to avoid or thwart law
28  enforcement detection throughout his involvement in this investigation. Based on my

COMPLAINT/*United States v. Werber* - 21
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  knowledge of the DTO, and specifically CARRILLO, I believe CARRILLO saw this type

2  of ruse or "walled-off" traffic stop for what it really was and discarded his phone (TT50)

3  immediately thereafter in an effort to evade further law enforcement detection.

4       51.    During the beginning of October 2018, through authorized interception of

5  LOPEZ's phone (TT51), agents intercepted CARRILLO, using a new phone (TT62).

6  Agents obtained authorization to track CARRILLO's new phone (TT62) on October 10,

7  2018, and, on October 18, 2018, obtained court authorization to intercept wire and

8  electronic communications over TT62. Agents observed that CARRILLO continued to

9  meet with DTO members in the Western District of Washington, again under

10  circumstances indicating to agents that he was picking up cash drug proceeds.

11       52.    As discussed above, CARRILLO traveled several times to 1st Avenue Self-

12  Storage in Seattle, Washington. During the first week of October 2018, I visited this

13  location and obtained records from that business regarding CARRILLO's activities there.

14  This business is a secured-access facility, meaning, each tenant has a specific entry code

15  he/she must enter in order to gain access to the secure storage portion of the facility.

16  TT50's tracking and physical surveillance showed CARRILLO visited this location on

17  September 19 and 20, 2018. Access records show *someone* accessed Unit 248B on

18  September 19 and September 20, 2018, at the very same time CARRILLO was at the

19  location. Based on this information alone, I believed CARRILLO accessed Unit 248B

20  during his visit to this location. My review of Unit 248B's rental agreement and other

21  records furthered my suspicion.

22       53.    My review of Unit 248B's rental records showed the unit is a small,

23  3' x 5' x 4' unit rented in Gregory WERBER's name, using his Cairo Drive address in

24  Arizona. These rental records showed WERBER first began renting this unit in February

25  2018, and has paid cash every month since for this rental. Someone has frequently

26  accessed this unit every month since WERBER began renting it. WERBER's pen-and-

27  ink signature is not on the rental documentation; he signed the documentation with an

28  electronic signature instead. This means either WERBER opted not to use his actual

COMPLAINT/*United States v. Werber* - 22
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  signature or he was not physically present when the account was established. This unit is

2  too small to store a large number of items inside of it, but it is more than large enough to

3  store a significant quantity of cash. Agents believe CARRILLO, WERBER, and possibly

4  others may use this secure storage facility to at least temporarily store a portion of the

5  DTO's drug proceeds.

6      54.    On October 16, 2018, agents executed a delayed-notice search warrant of

7  Unit 248B. The only items in the storage unit at the time of agents' court authorized

8  search were FedEx packaging materials, a large white plastic bag with the FedEx logo on

9  it, and a money counter. The money counter was in the large white plastic bag when

10  agents found it. Agents photographed all of the items in the storage unit during their

11  search and then put all of those items back just as they had found them, so as not to alert

12  CARRILLO or WERBER.

13      55.    WERBER's FedEx account records show he receives the majority of his

14  packages in Manhattan Beach, California, at a FedEx location close to WERBER's

15  residence and business in the same town. Records showed packages came from Seattle,

16  Bellevue, and Tukwila, Washington; Salt Lake City, Utah; Memphis, Tennessee; New

17  York, New York; Pewaukee, Wisconsin; Columbus, Ohio; and Scottsdale, Arizona.

18  WERBER signed for the packages sent to the FedEx store in Manhattan Beach.[7]

19      56.    Agents investigated into WERBER's international flight history. Travel

20  records and financial records such as credit card statements show WERBER had multiple

21  flights in and out of Mexico City (Mexico), Guadalajara (Jalisco, Mexico), and Puerto

22  Vallarta (Jalisco, Mexico) in 2018. WERBER's flights were brief trips. For instance,

23  on March 26, 2018, WERBER flew from Phoenix, Arizona, to Guadalajara, Mexico; then

24  on March 30, 2018, WERBER flew from Guadalajara, Mexico, to Seattle, Washington.

25  On April 23, 2018, WERBER flew from New York to Mexico City, Mexico; then on

26

27

---

[7] WERBER's FedEx records show that he has received FedEx shipments weighing at least approximately 600

28  pounds. Based on my training and experience, I know that a U.S. bill weighs one gram each. Investigators did not intercept or search these packages.

COMPLAINT/*United States v. Werber* - 23
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   April 27, 2018, WERBER flew from Mexico City, Mexico, to Phoenix, Arizona. Such

2   brief trips would be consistent with, for example, WERBER dropping off or picking up

3   drug proceeds.

4       57.     On November 14, 2018, agents were conducting surveillance in the area of

5   the Airmark Apartments, 229 Andover Park E, Tukwila, Washington. At 1:57 p.m.,

6   agents noticed real-time tracking data for WERBER's phone (TT37) was near the

7   Airmark Apartments, 229 Andover Park E, Tukwila, Washington. Moments later, agents

8   on physical surveillance observed CARRILLO and WERBER meeting in the lobby of the

9   apartment complex with one of the employees. At that time, WERBER and CARRILLO

10  appeared to be filling out paperwork, suggesting that this location would perhaps be a

11  new residence for CARRILLO.

12      58.     On November 15 and November 16, 2018, agents conducted physical and

13  electronic surveillance of LOPEZ. On both of those days, agents saw LOPEZ meet with

14  CARRILLO for two separate money drops that occurred at the Southcenter Mall. During

15  one of the drops, investigators saw LOPEZ deliver a small black bag to CARRILLO.

16  Based on intercepted communications over LOPEZ's phone and coordinated

17  surveillance, and my familiarity with this investigation, other investigators and I believe

18  the small black bag that LOPEZ delivered contained $59,000 in cash drug proceeds.

19      59.     After CARRILLO got the small black bag from LOPEZ, CARRILLO

20  returned to the hotel where WERBER was located. After CARRILLO got back from

21  meeting LOPEZ, CARRILLO drove WERBER back to SeaTac Airport.

22  **D.    WERBER's Use of Cash**

23      60.     Investigators have obtained records associated with bank accounts and

24  credit cards held by WERBER under various iterations of his name and/or his business

25  name, such as "Gregory Werber," "Gregory D. Werber," "Gregory D. Werber dba Coin

26  Service International," and "Gregory Werber dba Gregory David Werber." Review of

27  WERBER's financial records is ongoing. From what investigators have been able to

28  determine thus far, WERBER placed large deposits (ranging from $20,000 to $30,000)

COMPLAINT/*United States v. Werber* - 24
2017R01238

1    into his personal and business accounts; all of the deposits into WERBER's business

2    account were cash deposits. The deposits into WERBER's personal account were split

3    between some small "e-Deposits" (usually hundreds of dollars), large cash deposits (as

4    high as $30,000), and large transfers from his business account (as much as $76,000).

5    These banking records showed WERBER has routinely taken large sums of cash into his

6    business account, then transfer that money to his personal account, and then put that

7    money into a "Coinbase" account. Based on my training and experience, I know that

8    Coinbase is a secure online platform for buying, selling, transferring, and storing digital

9    currency.

10       61.    In total, bank records identified thus far show that from January 1, 2017,

11   through October 22, 2018, more than $607,000 in cash was either deposited to

12   WERBER's bank accounts or used for payments on his credit cards. During that same

13   period, $467,400 was transferred from WERBER's bank accounts to Coinbase.

14   WERBER also used funds from his accounts to purchase more than $25,000 in airfare

15   and to pay more than $17,000 for hotel stays.

16       62. ·  Most of the cash deposited to accounts controlled by WERBER was

17   deposited between January and March of 2018. During these three months, $503,193 in

18   cash was deposited, representing 83% of the total cash deposited during the entire 22-

19   month time period that was reviewed. $183,684 of the $509,193 in cash deposits was

20   made in Washington State.

21       63.    WERBER created an account with Coinbase on October 8, 2016. The

22   address associated with the account was 2318 E Cairo Dr, Tempe, AZ with an email of

23   gregwerber@gmail.com. WERBER associated a Bank of America credit card, two

24   Huntington National Bank debit cards, two US bank debit cards, and an unknown debit

25   card to his Coinbase account. Similar to the timing of the cash transactions mentioned

26   above, both bank records and Coinbase records show Werber's activity stopped in March

27   of 2018, with March 26, 2018, being the last transaction date.

28

COMPLAINT/*United States v. Werber* - 25
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  **E.    WERBER Offers to Help an Undercover Agent with his Cash Problem**

2      **1.    November 17, 2018:  UC1 calls WERBER (TT37) using WhatsApp**

3      64.    Investigators introduced an undercover agent (hereinafter "UC1") to

4  Gregory WERBER on November 17, 2018.  On that date, UC1 placed a "cold call" to

5  WERBER, at TT37, over WhatsApp.  This call was recorded and lasted approximately 16

6  minutes and 10 seconds.

7      65.    WERBER answered the call and confirmed he was "Greg."  UC1 explained

8  that he hoped WERBER might be able to help UC1.  WERBER asked if UC1 was buying

9  or selling bitcoin.  UC1 professed to know nothing about bitcoin or "crypto stuff."  UC1

10  stated he had money to buy bitcoin or whatever WERBER might recommend.  UC1

11  explained that he needed to buy a house because his girlfriend was going to have a baby,

12  however, UC1 was not able to use, or do anything with, the cash that he had.  WERBER

13  asked UC1 if he was in Los Angeles, and UC1 said he was based in Washington.  After

14  clarifying that UC1 meant Washington State, WERBER said he had been in Washington

15  two days ago.  UC1 said he regretted not calling WERBER sooner.

16      66.    WERBER said he could help UC1.  WERBER explained that some people

17  buy bitcoin as an investment because they believe it will go up in value, and some people

18  buy it for its utility, meaning, "You could basically have all the money in the world on

19  your phone and go anywhere and send it anywhere at will."  WERBER said it was a good

20  time to buy bitcoin because the price had crashed.  WERBER also explained that,

21  "bitcoin travels well.  You can take it anywhere you want to go, and you can send it

22  anywhere you want to send it."  WERBER explained his business was buying and selling

23  bitcoin, and that he would help UC1 as best he could.

24      67.    UC1 reiterated that he wanted to buy a house for his girlfriend and their

25  baby, but was concerned that using his cash might "be a little alarming to some people"

26  or might "flag" attention.  WERBER said he lived in a fairly expensive area of California

27  and that there had been some multimillion dollar homes there that had been purchased

28  with bitcoin.

COMPLAINT/*United States v. Werber* - 26
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

68.     WERBER suggested that he and UC1 sit down to discuss UC1's needs, and WERBER stated, "I will do what I can for you." UC1 offered to buy WERBER a plane ticket to travel to Washington so they could talk in person. WERBER said he did travel to Washington, but not very often. WERBER explained that he would travel to meet his clients if it is worth it, but generally, he preferred that his clients came to see him. WERBER said that if UC1 wanted to speak face to face, they could do so at his private office, which was conveniently located near the airport.

69.     UC1 asked if he should take $700,000 at one time to WERBER, or if they should do a bunch of smaller bitcoin transactions. WERBER explained that he tried to do deals of $100,000 to $200,000 at a time, although he could arrange to do a bigger deal. UC1 said $100,000 to $200,000 at a time would be fine because he had some time before the baby would arrive.

70.     UC1 explained that he wanted to buy a house on the "peninsula," near the water, "across the Narrows Bridge." WERBER asked, "The bridge that goes by that stadium?" UC1 confirmed that it was the bridge by Cheney Stadium. WERBER asked how much UC1 wanted to spend on the home. UC1 said he wanted to spend $500,000 or $600,000 on the home. UC1 also stated that his girlfriend did not know what he did for a living.

71.     WERBER asked UC1 if he wanted to discuss these matters face to face, and UC1 agreed. WERBER asked if UC1 could come to him. UC1 said he would check with his girlfriend about that. WERBER said he does go to Washington and that even if WERBER was not in Washington, there were "arrangements" WERBER could make "to do our deal." WERBER stated, "I understand your needs, so we'll work on it," adding, "I'll take care of you." WERBER described himself as "in business" and said, "Everyone who deals with me knows I'm a straight guy. If I say something, I'm going to do it." WERBER said UC1 would be happy with WERBER's service.

72.     WERBER and UC1 discussed their schedules for a few minutes to coordinate when they could meet in person to talk. WERBER also said they did not need

COMPLAINT/*United States v. Werber* - 27
2017R01238

1  to be physically in the room together to actually do a deal because he had "methods" that

2  would work for them.  WERBER and UC1 agreed to communicate further and to meet at

3  WERBER's business toward the end of November 2018.  At the end of the call,

4  WERBER said, "I'm looking forward to hearing from you."

5      73.     In subsequent communications, WERBER and UC1 agreed that UC1 would

6  meet with WERBER at his office for Coin Services International in Manhattan Beach,

7  California, on the Wednesday before Thanksgiving (*i.e.*, November 21, 2018).

8      **2.     November 21, 2018: UC1 Meets in Person with WERBER**

9      74.     On November 21, 2018, UC1 met with WERBER face-to-face at Coin

10  Services International, 3922 Highland Avenue, Manhattan Beach, California.  The

11  meeting between UC1 and WERBER lasted approximately 95 minutes and was recorded.

12  UC1 recognized WERBER from having previously viewed WERBER's driver's license

13  photo.  I have reviewed the audio recordings discussed in this Affidavit, and I recognized

14  WERBER's voice in the body wires and recorded calls discussed herein.

15      75.     When UC1 arrived at Coin Services International in Manhattan Beach,

16  WERBER greeted UC1, welcomed UC1 into his offices, and offered him a drink.  At the

17  time of the meeting, WERBER's offices were under construction.  WERBER apologized

18  for the noise and explained that his office would be four times bigger when the

19  construction ended.  Although WERBER commented that said that his secretary "might

20  be coming back later," she did not return to WERBER's office during his meeting with

21  UC1.

22      76.     WERBER began by explaining that he was "in the service business" and

23  stated that, "I'm here to find out what your needs are and to help you as best I can."

24  WERBER asked UC1, "You have a bunch of money—a continuing flow of money—am I

25  getting this right?  Is it coming from bitcoin, or something like that?  You tell me how

26  much you want to tell me."  UC1 explained that his problem was that he could not use the

27  money that he had.  WERBER asked about what form UC1's cash was in.  UC1

28  explained that the cash came to him as a mix of denominations but he has people change

1  it for him, so UC1's cash was banded and organized by denomination.  Based on my
2  training and experience, and my discussions with other experienced investigators, I know
3  that drug traffickers often exchange smaller denomination bills for larger denomination
4  bills so that their cash is less bulky.  Additionally, I know that money launderers and drug
5  traffickers often use money counters to count their currency, which is then banded and
6  wrapped.

7       77.    WERBER asked how long this had been going on for UC1.  UC1 explained
8  he started in college and that he paid for college this way.  UC1 said he now was based in
9  Washington and met most of his clients in Seattle.  UC1 told WERBER that even his
10  girlfriend did not know what UC1 did for a living, although she thought he had
11  something do with selling things on Amazon and she knew that UC1 worked a lot.

12       78.    WERBER asked UC1 what kind of work UC1 did.  After hesitating for a
13  moment, UC1 said he was in "sales."  UC1 said that he managed other people and did not
14  do the hands on work any longer.  UC1 said he took calls, dealt with people, and made
15  sure stuff was delivered on time.   UC1 said he was keeping his cash in storage, and the
16  cash kept coming in.  UC1 said that he was making $20,000 to $50,000 in cash profits
17  every week, after he paid everyone he needed to pay.

18       79.    WERBER asked UC1 how much money he had.  UC1 said, "more than
19  $560,000," and WERBER responded, "that's not that much."  WERBER asked UC1 if
20  his main concern was to justify his income and if UC1 had had a job with a 1099.  UC1
21  said that he did not have such a job, although his girlfriend thought he did.  WERBER
22  asked if UC1 was self-employed, and UC1 said he was.  UC1 added that he had a bank
23  account but did not put much of his money in there, not more than $5,000 at a time.
24  WERBER then described the services he offered, with such options as setting up a
25  company that employed UC1 or a business that would show some income for him, or
26  putting together an investment that would pay off.

27       80.    After WERBER and UC1 had been talking for a little over eight minutes,
28  an unidentified male came to WERBER's office.  WERBER politely excused himself and

COMPLAINT/*United States v. Werber* - 29
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  met briefly with the unidentified male behind closed doors.  The unidentified male then
2  left, carrying a small bag with him.

3    81.    WERBER then returned to his conversation with UC1.  WERBER told
4  UC1 that UC1 needed to think about what kind of lifestyle he wanted to lead, and
5  whether he wanted to spend $100,000 or $80,000 per year.  WERBER repeated the
6  options he mentioned before, and then said the easiest thing for WERBER to do for UC1
7  was cryptocurrency.

8    82.    WERBER explained that he could move cash from UC1 and put it into
9  bitcoin.  WERBER acknowledged that bitcoin was volatile and the price had dropped
10  recently, although WERBER firmly believed the price would go up over time.  WERBER
11  explained that there were crypto alternatives such as "tether" that were more stable.
12  WERBER explained that "tether" was a coin with value tethered to the price of a dollar.
13  WERBER explained, regardless of the merits of cryptocurrency as an investment,
14  holding assets as cryptocurrency was superior to cash.  WERBER explained that cash is
15  bulky and hard to move, whereas with cryptocurrency, "You could literally have
16  everything you have with you everywhere you go on your phone."  WERBER also said
17  that if UC1 bought cryptocurrency with him, he was also able to cash UC1 out at any
18  time.  WERBER said, "I'm your guy."

19    83.    WERBER said that he made a lot of money from buying and selling
20  bitcoin.  WERBER estimated that if UC1 gave him half a million dollars in cash,
21  WERBER could turn it into bitcoin within a week, or less.  WERBER said he was
22  constantly trading his cash for bitcoin and that he had a pretty good network.  WERBER
23  asked if that was what UC1 wanted to do, and also reiterated that UC1 could acquire
24  tether, as opposed to bitcoin.  WERBER told UC1, "You probably have enough things to
25  worry about.  I don't want to give you one more thing to worry about.  I want to give you
26  one less thing to worry about."

27    84.    WERBER then started talking about Coinbase, which WERBER described
28  as the biggest, most prestigious, most trustworthy, and most legitimate cryptocurrency

COMPLAINT/*United States v. Werber* - 30
2017R01238

1  exchange in the world.  WERBER said Coinbase was very close with the government,

2  which WERBER described as "both good and bad."  WERBER explained that the

3  government would be able to see everything UC1 would do with Coinbase, but dealing

4  with Coinbase was not suspicious.  WERBER also said that Coinbase was very "KYC

5  and AML," which WERBER explained meant "know your customer" and "anti-money

6  laundering."  WERBER said Coinbase did everything to comply with the rules.

7  WERBER said Coinbase wanted to know who its users really were, but that was not a big

8  deal; a credit card would suffice.  WERBER suggested that UC1 buy tether and hold it in

9  a Coinbase account.  WERBER explained that although tether could not necessarily be

10  used everywhere, it could, with one click, be exchanged into bitcoin.

11      85.    WERBER said that, as he was sure UC1 knew, cash was bulky and there

12  were "security issues" with it.  With cryptocurrency, however, UC1 could put as much

13  security as he wanted, and could keep it on his phone.  WERBER noted that WERBER

14  did not really like to hold client's money.  WERBER said he preferred to show clients

15  how to hold it for themselves.  WERBER said that most of his clients were buyers and

16  sellers of cryptocurrency and that it was pretty straightforward.

17      86.    WERBER asked UC1 if he had ever done any cryptocurrency transactions.

18  UC1 said he had not.  UC1 said he did not really understand cryptocurrency terms like

19  "blockchain" or "wallets."  WERBER assured UC1 that, "You don't really need to know

20  all that.  All you need to know is how to use your wallet.  It's basically an app."

21      87.    WERBER said UC1 could use two-factor authentication as security for his

22  wallet.  WERBER emphasized that it was absolutely critical that UC1 not lose his

23  password to his wallet, because "if you lose your password, then you've lost your

24  bitcoin."  WERBER said that as long as UC1 – and only UC1 – knew UC1's password,

25  then UC1's wallet would be "unhackable."  WERBER explained that UC1 could keep his

26  bitcoin in an offline "cold wallet" for added security.

27      88.    WERBER explained that bitcoin are in cyberspace, and a "wallet" is a

28  series of cryptographic keys that give the wallet's owner access to the "blockchain."

COMPLAINT/*United States v. Werber* - 31
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   WERBER said that UC1 should keep his keys off line until he needed to access his
2   bitcoin.   WERBER said the only way to hack it would be if UC1 compromised his own
3   security.   WERBER reiterated that the government cannot get into peer-to-peer (P2P)
4   encryption and that it was unhackable.   WERBER explained that a "wallet" is code for
5   the place on the internet where the bitcoin are.

6        89.   WERBER explained that there were cold storage devices made for
7   cryptocurrency, which were basically like thumb drives.   WERBER explained that UC1
8   could put such his bitcoin on a cold storage device, put the device in a mason jar, and
9   bury it.   WERBER explained that these could be safety funds that only UC1 would know
10  about.

11       90.   WERBER said he bought and sold bitcoin, and made a percentage on every
12  deal.   WERBER said he generally did pretty big deals, with low fees and very good
13  service.   WERBER said that this was what he did for a living and he always kept his
14  word.

15       91.   WERBER then asked, "How far do you want to go with this?  How far do
16  you want to go in the near term and the long term?  Basically, you want to be able to buy
17  a home?"  UC1 confirmed that he wanted to get a house and have things set up so that if
18  something were to happen to UC1, his girlfriend and kid would be taken care of.  UC1
19  asked if he could get something like a house but put it in his girlfriend's name, so that no
20  matter what happened to him, she would be able to keep the house.  UC1 said he planned
21  on spending $560,000 on the house, but he had other cash.  UC1 said his initial idea was
22  to buy a house outright, but UC1 was concerned that would raise a red flag, because he
23  could not just bring a bunch of cash to a title agency.

24       92.   WERBER explained that UC1 could buy house outright for cash, but,
25  "worst case scenario," if someone started looking at UC1's life, and saw UC1 just bought
26  house for $560,000 but was not able justify it, the government would try to seize it.
27  WERBER said there would be several way for UC1 to protect himself, such as by putting
28  the house in his wife's name, but the government could still take it from her.  The

COMPLAINT/*United States v. Werber* - 32
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  government would say that she was just a "straw purchaser" whereas UC1 was really the
2  person who bought the house.

3        93.    WERBER explained that UC1 could also protect his house by being the
4  "beneficial owner" without being the "actual owner." For example, WERBER explained
5  that he could start a company that owned UC1's house and UC1 would present himself as
6  a renter although "for all purposes," UC1 would be the owner of the home, such as when
7  UC1 wanted to sell it. WERBER said he could even set something up where UC1 would
8  be making payments to that company.

9        94.    WERBER cautioned that the government could try to take UC1's equity in
10  the home. However, WERBER added, there were things WERBER could do to make it
11  appear that UC1's equity in the home was always less than the actual value of the loan –
12  "but that's just on paper," as WERBER put it. WERBER explained that UC1 could
13  constantly take out second mortgages on his house, so "on paper it always looks like you
14  owe more than it's worth." However, WERBER said, "you're doing it with the owner,
15  and you are the owner."

16        95.    WERBER said that the IRS comes after people for taxes when the IRS
17  thinks there is something to take. WERBER said, "You may owe a million dollars," but
18  if there's nothing to take, the government would not be interested. WERBER stated,
19  "Think about what you want to do. Do you want to actually be the owner of the
20  property? Maybe not."

21        96.    UC1 acknowledged that there was a possibility of something happening to
22  him from the government and said he wanted his family protected. WERBER assured
23  him that the government "can't take cryptocurrency from you – they won't even know
24  that you have it, depending on what you do it." WERBER said, "We're talking about
25  ways to legitimize your income and justify your lifestyle," and, considering the need to
26  ensure UC1 had access to his funds, "cryptocurrency is the way to go."

27        97.    WERBER recommended that "we" get some accounts opened for UC1 and
28  encouraged UC1 to buy some cryptocurrency, like tether, which UC1 could trade on an

COMPLAINT/*United States v. Werber* - 33
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   exchange like Coinbase.  WERBER explained there was no "off exchange" for tether, but

2   UC1 would be able to trade it at will into bitcoin.  WERBER said, "If you want to use a

3   guy like me to convert your cash into crypto, I can do that.  And I actually can do that for

4   you in Seattle.  I have a way to do it in Seattle."  WERBER noted that he had just been up

5   in Seattle for the day, and explained that he did a lot of traveling.

6         98.    WERBER said that just to get UC1's feet wet, "we should do some crypto

7   deals," which would also serve to relieve UC1 of his cash.  WERBER said he could also

8   cash crypto out for UC1 as well.  WERBER explained that for trades greater than

9   $20,000 in cash, he generally bought bitcoin for a 4% fee, and that he generally sold

10   bitcoin for a 3% fee, although he also adjusted his fees based on the market.

11         99.    WERBER brought up an exchange called Binance, which WERBER

12   described "as solid as can be."  WERBER said Binance is not a U.S. company, which is

13   good, and that UC1 would be able to open an account without giving them any personal

14   information, or almost no personal information.  WERBER explained that Binance was

15   located overseas and definitely would not give the government UC1's money, because

16   "they know that would ruin their model."

17        100.    WERBER suggested to UC1, "Probably the first deal we would do – I have

18   a guy I would work with in Seattle who would pick up the money and I would send you

19   the bitcoin, and that would happen instantaneously."  WERBER then walked through

20   how he would do a transaction for $100,000 and emphasized how he would be "really

21   transparent" with UC1 at every stage.  As WERBER walked through a possible

22   transaction, he explained that if even if UC1 were in Seattle, UC1 could simply copy and

23   paste UC1's 28-character alphanumeric address for UC1's wallet and send it to

24   WERBER.  WERBER explained that he would then send the bitcoin to UC1's wallet, and

25   the minute WERBER hit the button, the transaction would be visible on the blockchain.

26   WERBER explained that that once there was a confirmation, which would take ten

27   minutes to half an hour, there was no stopping the transaction.

28

COMPLAINT/*United States v. Werber* - 34
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1       101.   WERBER said that, "If we were to do deals in Seattle, I would probably go

2  there for first one, do the introduction."  UC1 asked if WERBER's guy in Seattle would

3  be freaked out.  WERBER assured UC1 that WERBER's guy was a "very cool

4  character."  WERBER said that it sounded like WERBER and UC1 would have an

5  ongoing relationship.  UC1 said he thought they could do a deal every week.

6       102.   UC1 then explicitly referenced the "opioid crisis."  UC1 stated that the

7  "opioid crisis" was "not going away."  UC1 stated that he was "literally turning away

8  business."  UC1 then said he expected to either increase or stay stable at $50,000 per

9  week from his business.

10       103.   WERBER suggested that he and UC1 started working together by UC1

11  acquiring cryptocurrency and getting comfortable with using it.  WERBER stated that

12  wherever UC1 would keep it or hold it, it would be on UC1's phone, "in a form you

13  could send it anywhere with a click."  WERBER said that once UC1 saw how

14  cryptocurrency works, WERBER was sure that UC1 would take to it.  Then WERBER

15  opined, "This is my take on it – for a guy in your business, you want to have what you

16  have as liquid and as secret as possible, in my opinion."

17       104.   WERBER again stated that a house was something that the government

18  could grab and that UC1 would need to justify.  WERBER assured UC1 that UC1 would

19  get better at financing over time and that UC1 needed to work up slowly from being a

20  renter making $30,000 per year, to living in a "house on the hill."  In the meantime,

21  WERBER explained, "you can have all the creature comforts that you want," and "I can

22  help you."  WERBER said that at some point UC1 might want to acquire assets that are

23  viewable to general public, like a house, but UC1 could not become that person

24  overnight.

25       105.   WERBER then repeated the security benefits and utility of cryptocurrency

26  versus cash, to which UC1 said that crypto sounded a lot better than wrapping his money

27  and keeping it in a storage unit.  WERBER then added, "I don't know what your business

28  is – but in my business, I know people I've dealt with my whole life – good, honest

COMPLAINT/*United States v. Werber* - 35
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | people – but when they're exposed to a lot of money, they can't handle it." WERBER
2 | explained that UC1 was vulnerable to the extent he had to trust people. WERBER opined
3 | that when something like a break-in happened, it was generally not a coincidence.
4 | WERBER explained that people come to him all the time and offer him deals, "but
5 | nothing gives me a better return than the work I'm doing right now. I presume it's the
6 | same thing for you."

7 |      106.   WERBER and UC1 then discussed their calendars and when they might be
8 | able to do a cryptocurrency deal. Turning back to the topic of fees, WERBER said his
9 | fee was 4% for clients who come to his office, because there are risks in traveling.
10 | WERBER surmised that UC1 did not want to travel to WERBER. UC1 explained that
11 | the money was not a problem; the problem was that it was hard to find people who were
12 | trustworthy. WERBER again asked UC1 if he could bring his cash to WERBER. UC1
13 | did not immediately agree. WERBER said, "We'll figure something out, we'll work it
14 | out." WERBER stated, "Obviously I'm doing this to make money – but I want to give
15 | you what you need."

16 |      107.   During their face-to-face meeting, WERBER showed UC1 some of
17 | WERBER's cryptocurrency wallets and account balances. UC1 noticed several
18 | cryptocurrency applications on WERBER's phone and saw that the balance on least a
19 | few of WERBER's accounts totaled around $200,000.

20 |      108.   The meeting concluded on friendly terms, and WERBER and UC1 agreed
21 | to conduct business before the end of November 2018.

22 |      109.   In subsequent communications, WERBER and UC1 discussed scheduling
23 | and the logistics of when and how to do their first deal together. WERBER offered to
24 | send his "agent" to meet with UC1 in Seattle. Ultimately, WERBER and UC1 agreed
25 | that UC1 would send some of his workers to bring $50,000 in cash to WERBER in his
26 | office in Manhattan Beach.

27 | **F.**     **WERBER Sells UC1 $50,000 Worth of Bitcoin (Minus WERBER's 3% Fee)**

28 |

1       110.   On November 26, 2018, WERBER and UC1 spoke over a WhatsApp call.

2 Agents recorded this call. During this call, WERBER told UC1 that he had "an agent in

3 Seattle that could take care of the transaction," but wanted to know how much money

4 UC1 was talking about. UC1 said he would like to start with "100" (referring to

5 $100,000) but then asked WERBER if he would be able to do $200,000 during the

6 following week. WERBER agreed to conduct the $100,000 transaction with UC1 during

7 the week of November 26, 2018, through his agent in Seattle. WERBER and UC1 ended

8 their call with the understanding that WERBER would send his agent to conduct the

9 transaction.

10       111.   After this call, WERBER sent UC1 a WhatsApp text message that read

11 "Contact O. His number is: (503) 482-3306." Telephone number (503) 482-3306 is

12 TT62. Based on tracking data, intercepted communications, and physical surveillance,

13 agents know Oscar CARRILLO is the user of this phone. Agents also believe "O" refers

14 to Oscar CARRILLO, since the letter "o" is the first letter of CARRILLO's name.

15       112.   After UC1 received CARRILLO's contact number (TT62), UC1 spoke to

16 WERBER once again about the transaction. WERBER said his agent was unable to

17 provide UC1 with a transaction confirmation at that time, but WERBER would send it to

18 UC1 within one or two days. UC1 voiced his concerns over this plan and the two

19 decided to wait to conduct the transaction. This call was recorded, but, due to a technical

20 glitch with the recording device, the recorded data was corrupted and lost.

21       113.   On November 27, 2018, UC1 called WERBER over WhatsApp and asked

22 WERBER how he would feel about UC1 sending one or two of his "guys" down to

23 WERBER's location in Manhattan Beach on November 28 or 29, 2018, to provide

24 WERBER with $100,000 of cash from UC1's business. WERBER said he had a

25 commitment with another client on November 28, but would do the transaction with

26 UC1. WERBER contemplated his and UC1's options during the conversation and asked

27 UC1, "Do you mind talking about this right now?" WERBER reiterated his concerns

28 about traveling up to Washington to conduct the transaction. He told UC1, "There's

COMPLAINT/*United States v. Werber* - 37
2017R01238

1   added risk … if I go up there, I'm basically in the same position you're in because I have
2   to come back here to deal with it", which UC1 understood as referring to transporting the
3   money. UC1 told WERBER that he understood what WERBER was saying and
4   WERBER reiterated, "there is a certain amount of risk" with regard to traveling with
5   cash.

6          114.   WERBER checked his accounts while UC1 was still on the line and told
7   UC1 he could a $90,000 transaction if UC1 was in WERBER's office at that time. UC1
8   suggested doing a $50,000 transaction instead and WERBER said he could conduct that
9   transaction because he felt he would be able to convert that amount of cash very quickly.
10  UC1 told WERBER he would send his workers from Washington to WERBER's
11  location. UC1 also vouched for the people he was sending to meet with WERBER and
12  let WERBER know they were also involved in UC1's drug business by saying they
13  "worked" with UC1, so they "know what's up." WERBER said he preferred large bills.
14  WERBER said, "the larger the better" and assumed UC1 would prefer to have his people
15  travel with the smallest physical amount of cash as possible.

16         115.   After this call, agents obtained $100,000 in cash (in 50- and 100-dollar
17  bills) of DEA authorized funds. I organized the cash into $10,000 increments and bound
18  each $10,000 bundle using multiple rubber bands. Two other DEA agents transported
19  these bills to Los Angeles and then provided them to two other undercover agents (UC2
20  and UC3).

21         116.   On November 29, 2018, UC1 and WERBER exchanged a series of
22  WhatsApp text messages. UC1 said his "friends" would be to WERBER's office that
23  day. WERBER asked for an "ETA," and UC1 told WERBER they were an hour away.
24  UC1 described UC2 and UC3 to WERBER and asked WERBER if he could do "the
25  whole 100 today or just 50." WERBER said he could transfer "just 50."

26         117.   About an hour after these messages, UC2 and UC3 arrived at WERBER's
27  office in Manhattan Beach. Their meeting with WERBER lasted approximately 17
28  minutes and was recorded.

COMPLAINT/*United States v. Werber* - 38
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

118.   WERBER offered them something to drink, which they declined. UC2 confirmed that they had brought $50,000 cash, a QR code, and a wallet, so that WERBER could do an "on the spot" transaction. WERBER explained that he would find the price for bitcoin on Coinbase and multiply the price by 1.03 because WERBER's fee was 3% for selling bitcoin. WERBER used what he called a "blockchain explorer" to confirm that the UC wallet was empty.

119.   WERBER then said, "The first thing we do is count the money." UC2 and UC3 presented WERBER with the $50,000 of DEA funds (100-dollar bills, banded into five packs of $10,000 each). WERBER ran all of the cash through his money counter.

120.   After briefly chatting about the weather, WERBER said that he was going to put together a system to accommodate the UCs better. WERBER said sending cash through the mail was "fairly safe" and "the odds are, you'll be fine." WERBER told the UCs that he would explain his "protocol" for transactions and show them what he was doing. WERBER told them that if they had any questions for him, "do not hesitate to ask." WERBER then showed the UCs through the math for the deal, and they agreed with the number of bitcoins that WERBER would transfer to the UC wallet.

121.   After WERBER verified the bitcoin amount was correct, WERBER said it was time to do the transaction. WERBER then said, "This money is mine now." UC2 agreed. WERBER proceeded to transfer the agreed number of bitcoin to UC2's wallet. WERBER said that the transaction was processing and was a "done deal." WERBER said it generally takes ten minutes to half an hour for a confirmation. After a few minutes, UC2 and WERBER received confirmation that WERBER had indeed transferred the bitcoin to UC2's wallet.

122.   Toward the end of the meeting, WERBER said he had a "guy in Seattle," and would work to accommodate the UCs' business in a low-risk, cost-effective way going forward.

123.   Thereafter, UC1, who was in the Seattle area during WERBER's meeting with UC2 and UC3, spoke with UC2 and UC3. They confirmed the deal had been

COMPLAINT/*United States v. Werber* - 39
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    successful. UC1 then contacted WERBER, who confirmed that WERBER thought

2    everything had gone smoothly as well. WERBER confirmed UC2 and UC3 had provided

3    him with "big bills" and told UC1, "glad you're happy. We'll make arrangements to

4    make it more convenient for you in the future." UC1 told WERBER, "that sounds

5    perfect," and asked, "You think I can see you or O next week?" WERBER replied,

6    "Yes." These communications with UC1 were all via WhatsApp text message.

7        124. As with UC1's personal meeting with WERBER, WERBER never asked

8    UC2 or UC3 for any identifying information. He never asked to see identification and

9    never wrote down any information pertaining to any of the UCs in any type of filing

10    system. Even over the course of their discussions, WERBER has never asked UC1 for

11    UC1's last name, let alone for any form of identification. UC1 and WERBER's phone

12    communications have only been through encrypted methods, such as WhatsApp.

## V.   CONCLUSION

14        125. Based on the above facts, I respectfully submit that there is probable cause

15    to believe that Gregory David WERBER did knowingly and intentionally commit money

16    laundering, in violation of Title 18, United States Code, Sections 1956(a)(3)(B),

17    1956(a)(3)(C) and 2.

19    ANTHONY DELVECCHIO,
       Complainant
20    Special Agent, Drug Enforcement Administration

22        Based on the Complaint and Affidavit sworn to before me, and subscribed in my

23    presence, the Court hereby finds that there is probable cause to believe the Defendant

24    committed the offense set forth in the Complaint.

25        Dated this 4th day of December, 2018.

27    THERESA L. FRICKE
28    United States Magistrate Judge

COMPLAINT/*United States v. Werber* - 40
2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800